REDACTED

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KEVIN D. ANTHONY,

                *Plaintiff*,

      v.

UNITED STATES OF AMERICA

              *Defendant*.

CASE NO. 3:19-cv-05337-BJR

ORDER GRANTING IN PART AND
DENYING IN PART UNITED STATES'
MOTION FOR SUMMARY JUDGMENT
AND MOTION TO DISMISS FOR LACK
OF SUBJECT MATTER JURISDICTION
AND GRANTING PLAINTIFF LEAVE TO
FILE A MOTION TO AMEND
COMPLAINT

## I.    INTRODUCTION

On November 5, 2015, U.S. Army Ranger Specialist Jesse M. Suhanec absented himself from Joint Base Lewis-McChord ("JBLM") just south of Tacoma, Washington and shot Plaintiff Kevin D. Anthony, a civilian, multiple times while Mr. Anthony sat in his truck.  While Mr. Anthony survived the attack, he was grievously injured and has been left with permanent disability. He now sues the United States and seeks to recover damages alleging that the event occurred as a result of the negligence of Army personnel.

Before the Court are two motions brought by Defendant United States.  First, the United States seeks dismissal of Plaintiff's claims on the grounds of lack of subject matter jurisdiction. Second, the United States seeks summary judgment.  United States' Mot. for Summ. J. and Mot.

1

to Dismiss for Lack of Subject Matter Jurisdiction, Dkt. No. 27 ("Mot.").[1]   Additionally, should the Court grant the United States' Motions, Plaintiff seeks leave to amend his Complaint.  Pl.'s Resp. to United States' Mot. for Summ. J. and Mot. to Dismiss for Lack of Subject Matter Jurisdiction ("Resp."), Dkt. No. 45 at 37.  Having reviewed the Motions, the opposition thereto, the record of the case, and the relevant legal authorities, the Court will grant the United States' Motion and grant Plaintiff leave to file a Motion to Amend Complaint.  The reasoning for the Court's decision follows.

## II.   BACKGROUND

The facts of this case are, for the most part, uncontested.  Suhanec was first inducted into the United States Army in 2011.  Mot. at 2–3.  It is uncontested that, at that time, the Army recruiter who inducted him identified signs that should have disqualified him from recruitment, ███████ ██████████████████████[2] but failed to disqualify him.  Resp. at 7–8 (citing Decl. of James J. Raffa, Ex. 1, Dkt. No. 49 at 111:12–22 ("Dep. of Jesse Suhanec")).[3]   Nevertheless, Suhanec went on to serve honorably in the armed forces, joining an elite Ranger unit and deploying twice to Afghanistan as part of Operations Enduring Freedom and Freedom's Sentinel, where he earned the Afghanistan Campaign Medal, the North Atlantic Treaty Organization ("NATO") Medal for service with NATO and the International Security Assistance Force, a Combat

---

[1] Pursuant to motion and Court order, the parties have filed large sections of their briefing under seal.  *See* Dkt. Nos. 22 (United States' Mot. to Seal), 32 (Order Granting the United States' Mot. to Seal), 44 (Pl.'s Mot. to Seal), 46 (Order Granting Mot. to Seal).  The Court will, therefore, cite only to the parties' redacted filings, where possible.

[2] The Court having sealed Suhanec's medical and other behavioral health records for the protection of his privacy, any reference to those will be redacted in this Order.  An unredacted version of this Order will be filed under seal.

[3] A redacted version of Suhanec's deposition is available at Decl. of Kristen R. Vogel, Ex. A, Dkt. No. 28-1.

Infantryman Badge, and a Good Conduct Medal.  Mot. at 4–5.

Suhanec returned to the United State from his second deployment to Afghanistan in May 2015.  *Id.* at 5.  He was assigned the post of Unit Armorer at JBLM, which entails managing the arms room where weapons and ammunition are stored, including the firearm he used in his attack on Mr. Anthony.  *Id.* at 6.  In order to be assigned this position, the United States claims Suhanec had to go through a selection process by his superiors, training, a background check, and security screening, all of which did not indicate that Suhanec was a security risk.  *Id.*  At the same time, however, Suhanec began receiving mental health and behavioral care from the military after reporting ████████████████████████████.  Mot. at 8–10.

According to the agreed account of what occurred, on the morning of the attack, November 5, 2015, Suhanec ████████████████████████████████████████████████ ████████████████████████████████████████, after which he obtained a 9mm handgun and ammunition from the Unit Armory and a large van using his army privileges.  Compl., Dkt. No. 1 ¶ 2.2–2.3; Mot. at 10; Resp. at 1, 5.  He then drove into Lakewood, Washington, where he encountered Mr. Anthony.  Compl. ¶¶ 2.1, 2.4.  According to Plaintiff, Suhanec demanded his truck and, when he did not comply, Suhanec shot nine rounds into the truck using the 9mm handgun, wounding Mr. Anthony five times in the head, chest, and arms.  *Id.* ¶ 2.5.

On October 24, 2016, Suhanec pled guilty to two counts of attempted first-degree robbery, two counts of second-degree assault, attempted residential burglary, and attempted vehicle theft in the Superior Court of Washington, Pierce County.  Mot. at 11; *see also* Connaroe Decl., Dkt. No. 29-2 (Statement of Defendant on Plea of Guilty to Non-Sex Offense).  Based on his plea, Suhanec was sentenced to six years confinement.  Mot. at 11.

3

On April 24, 2019, Plaintiff filed the present suit pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, claiming that the Army's negligence was responsible for his injuries. Compl., Dkt. No. 1. Specifically, Plaintiff alleges six instances of negligence on the part of Army personnel in the run-up to the shooting, which he claims negligently contributed to the Army's failure to recognize Suhanec's danger and prevent him from obtaining the means to carry out his attack. *See* Resp. at 4–6. These include the following:

> The recruitment of Suhanec in 2011 by the Army recruiter despite the recruiter's identification of signs that should have disqualified Suhanec from recruitment and the recruiter's alleged instruction to Suhanec to cover up those signs to avoid disqualification. *See also id.* at 7–8.

> Suhanec's assignment as Unit Armorer by his Chain of Command despite not meeting the training requirements for the position. *See also id.* at 8–10. According to Plaintiff, Suhanec did not receive the proper training until nearly three months after assuming the post, the anxiety from which contributed to his mental health issues.

> The failure of two mental and behavioral health specialists, social worker Gordon Retterath and Physician's Assistant Captain Jeffrey Wittkopp, to order an evaluation of Suhanec's fitness for duty once they allegedly identified disqualifying signs of mental and behavioral health issues prior to the attack. *See also id.* at 11–17.

> The failure of now-Staff Sargent, then-Specialist, Kyle E. Cassidy to report concerning behavior by Suhanec prior to the day of the shooting, including extended absences from the Armory without justification and signs of increased stress and agitation. *See also id.* at 17–19. At the time of the incident, Cassidy served as Assistant Unit Armorer subordinate to Suhanec.

> Cassidy's failure to prevent Suhanec from removing the firearm and ammunition from the Armory the day of the attack. *See also id.* at 19–21.

> The provision by Specialist Brian Palmer of keys to the van used by Suhanec during his attack, despite Suhanec's failure to give adequate reason to use an Army vehicle. *See also id.* at 22–24.

As indicated *supra*, Defendants moved to dismiss Plaintiff's claims under both Federal

4

Rules of Civil Procedure ("FRCP") 12(b)(1) for lack of subject-matter jurisdiction and FRCP 56 pursuant to summary judgment.  Mot., Dkt. No. 27.

## III.   MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A.  Legal Standard

The United States moves to dismiss most of Plaintiff's claims arguing that the Court lacks subject matter jurisdiction.  Mot. at 18–24.  Under FRCP 12(b)(1), a complaint must be dismissed where the court lacks subject matter jurisdiction. FED. R. CIV. P. 12(b)(1).  According to the United States, many of the actions Plaintiff challenges fall within the discretionary function exception to the FTCA, depriving the Court of subject matter jurisdiction.  As the Court is obligated to ensure it has jurisdiction before it can proceed to the merits of the case, the Court addresses the Motion to Dismiss first.

### B.  Discretionary Function Exception to the Federal Tort Claims Act

"The United States is immune from suit unless it unequivocally consents."  *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1327 (2020) (citing *United States v. Navajo Nation*, 556 U.S. 287, 289 (2009)).  Sovereign immunity is "jurisdictional in nature" and, as such, there is no subject matter jurisdiction unless sovereign immunity has been waived.  *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1127 (9th Cir. 2019) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).

Under the FTCA, the government has waived its sovereign immunity for "civil actions on claims against the United States, for money damages . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government. . .."  28 U.S.C. § 1346(b)(1).  The FTCA, however, contains several exceptions which, when met, restore sovereign

5

immunity.  The operative exception in this case is the discretionary function exception, which provides that the FTCA's waiver of immunity shall not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government . . .."  28 U.S.C. § 2680(a); *see also Kim v. United States*, 940 F.3d 484, 487 (9th Cir. 2019).  The "point of the exception," is to "'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy.'"  *Kim*, 940 F.3d at 487 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).  It is the United States' burden to demonstrate that the exception applies. *Id.*

Judicial determination of the applicability of the discretionary function exception occurs in two steps.  First, the Court determines "whether the challenged actions involve an element of judgment or choice."  *Kim*, 940 F.3d at 487 (quoting *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008)).  This requirement is not met where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Berkovitz*, 486 U.S. at 536.  "If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'"  *Terbush*, 516 F.3d at 1129 (quoting *Berkovitz*, 486 U.S. at 536).

If, however, the action in question involves an "element of judgment or choice," the Court proceeds to the second step; determining whether that judgment or choice is "of the kind that the discretionary function exception was designed to shield."  *Kim*, 940 F.3d at 487 (quoting *Terbush*, 516 F.3d at 1129).  The Supreme Court has explained that the exception was designed only to shield governmental action based on considerations of public policy.  *Berkovitz*, 486 U.S. at 539.

6

This consideration does not rest on the subjective intent of the governmental agent but, rather, whether the action itself is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).  That is, the choices "must be susceptible to some consideration of 'social, economic, or political policy.'" *Kim*, 940 F.3d at 487 (9th Cir. 2019) (quoting *Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015)).  The focus of the inquiry is whether the actions themselves are susceptible to a policy analysis, not whether the government actor "actually took such public policy judgements into consideration when making the decision." *Morales v. United States*, 895 F.3d 708, 713 (9th Cir. 2018) (quoting *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998)).

The "proper level of inquiry" of discretionary function analysis occurs "act by act." *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995); *see, e.g.*, *Jahr v. United States*, 259 F. Supp. 3d 1158, 1163–68 (W.D. Wash. 2017).  In other words, the overall question is "not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance" leading to an analysis of "[e]ach separate action . . . to determine whether the specific actor had discretion of a type Congress intended to shield." *In re Glacier Bay*, 71 F.3d at 1451.

### C. Individual Acts of Alleged Negligence

The Court examines five out of six of the allegedly negligent acts of Army personnel.  *See supra* at 4.  As to the sixth, the United States concedes that Suhanec's Chain of Command failed to follow a non-discretionary Army regulation requiring Suhanec to complete training prior to taking the post of Unit Armorer.  United States' Reply in Further Support of Mot. for Summ. J. and Mot. to Dismiss for Lack of Subject Matter Jurisdiction, Dkt. No. 58 ("Reply") at 15.  Thus,

7

the Court has subject matter jurisdiction over Plaintiff's failure to train claim.

### 1. Suhanec's Recruitment

Plaintiff claims that the unnamed recruiter who inducted Suhanec in 2011 failed to follow non-discretionary Army regulations setting recruitment standards after he identified signs that should have disqualified Suhanec from recruitment. Resp. at 7–8. Based on the violation of mandatory Army regulations, Plaintiff argues that the Court need not proceed past the first step of discretionary function analysis because there was no element of discretion afforded to the recruiter.

The United States argues that the operative versions of the regulations in place at the time of Suhanec's recruitment on which Plaintiff relies, namely Department of Defense ("DoD") Instruction 6130.03 and Chapter 2 of the Army Regulation ("AR") 40-501, do not provide a mandatory course of action which removed the recruiter's discretion to determine whether Suhanec was fit for induction into military service. Reply at 14–15, 16; *see also* Suppl. Decl. of Maj. Richard Connaroe, Ex. N, Dkt. No. 62-1 (DoD Instruction 6130.03: Medical Standards for Appointment, Enlistment, or Induction in the Military Services) ("DoD Instruction 6130.03"); Suppl. Decl. of Maj. Richard Connaroe, Ex. O, Dkt. No. 62-2 (AR 40-501: Standards of Medical Fitness) ("AR 40-501").

The Court finds that the discretionary function exception does not apply. The Army recruiter identified Suhanec's indications of ▮▮▮▮▮▮▮▮. The Army's regulations in operation at the time removed any discretion as to whether this was a disqualification. Upon examination, the then-current versions of both DoD Instruction 6130.03 and Chapter 2 of AR 40-501 provide

1

2

3

4

5

6

7

8

9

10

11

12

13    Once a recruiter identifies a sign that the Army had determined by regulation should be

14   disqualifying, the judgment of whether to follow that regulation is not a consideration susceptible

15   to discretionary decision making.  *See Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000)

16   (holding that a soldier's enlistment after Air Force's failure to undertake further mental and

17   psychiatric review required by fitness standards, including AR 40-501, was not shielded by

18   discretionary function exception).

19

20    As such, the Court finds it has subject matter jurisdiction over this claim.

21   **2.    Failure of Mental Health Professionals to Order Evaluation of Suhanec's Fitness
         for Duty**

22

23    Plaintiff next claims that both mental health professionals who were involved in Suhanec's

24   treatment, Retterath and Wittkopp, were negligent when they observed signs that, according to

25   Plaintiff, required them to refer Suhanec for an assessment of continued fitness to serve pursuant

9

to the Army's own regulations.  Resp. at 11–17.  The United States counters that the operative version of the relevant regulation, AR 40-501, contains no specific mandates requiring the mental health professionals to refer Suhanec based on the signs they observed during their treatment. Reply at 15–18.  Therefore, the United States argues, the decision as to whether Suhanec was still fit to serve falls within the discretionary function exception.

### a.  Element of Judgment or Choice

The standard for retention in the armed services is outlined in Chapter 3 of AR 40-501. AR 40-501 at 30 ("Chapter [3] gives the various medical conditions and physical defects which may render a Soldier unfit for further military service. . ..").  Additionally, as Suhanec was an Army Ranger, a separate standard, provided in Chapter 5 of AR 40-501, applied to his retention as a Ranger.  See id. at 61 ("[C]hapter [5] sets forth medical conditions and physical defects that are causes for rejection for . . . Ranger training and duty."); id. at 64 ("Medical fitness standards for retention for . . . Ranger duty").  Plaintiff claims that, had the mental health professionals concluded as they should have, that Suhanec was unfit to serve in either the Rangers or the military more broadly, he would not have obtained the means to conduct his attack on Plaintiff.

Beginning with the more narrow standards applicable to retention as a Ranger, Chapter 5 provides that "[r]etention of an individual in . . . Ranger duty . . . will be based on" two factors: "(a) [h]is or her continued demonstrated ability to perform satisfactorily his or her duty as . . . enlisted Soldier, Ranger, or Special forces member" and "(b) the effect upon the individual's health and well-being by remaining on . . . Ranger . . . duty."  Id.  Thus, unlike the enlistment standards which designated a particular disqualifying condition that Suhanec demonstrated, these regulations are couched in non-mandatory terms leaving the judgment as to the continued fitness of a soldier

10

to serve in the Rangers to the evaluator.

The standards for retention in military service in Chapter 3 demonstrate the same discretion to determine whether a soldier is fit to continue to serve. For example, Chapter 3 states that "[p]hysicians who identify Soldiers with medical conditions listed in this chapter should initiate an MEB[4] at the time of identification" but that "[m]any of the conditions listed in this chapter . . . fall below retention standards only if the condition has precluded or prevented successful performance of duty." *Id.* at 31. This section demonstrates two levels of discretion. First, whether a soldier has a disqualifying condition and, second, whether that condition prevents the soldier from performing their duties. This conclusion is supported by the rest of the provision, which continues "[i]n those cases when it is clear the condition is long standing and has not prevented the Soldier from reaching retirement, then the Soldier meets the standard and MEB is not required." *Id.*

For the types of disqualifying conditions which Plaintiff claims Suhanec displayed,[5] referral for review of continued fitness is only required where the "[p]ersistence or recurrence of symptoms" are (1) "sufficient to require extended or recurrent hospitalization;" (2) "necessitat[e] limitations of duty or duty in protected environment;" or (3) "result[] in interference with effective military performance." *Id.* at 42–43. Thus, again, the standards do not prescribe a specific

---

[4] "MEB" refers to a "medical evaluation board." AR 40-501 at 144. An MEB is a "process designed to determine whether a Service member's long-term medical condition enables him/her to continue to meet medical retention standards, in accordance with military service regulations." MILITARY HEALTH SYSTEM, *Medical Evaluation Board*, https://www.health.mil/Military-Health-Topics/Conditions-and-Treatments/Physical-Disability/Disability-Evaluation/Medical-Evaluation (last visited November 2, 2020).

[5] Namely, ███████████████████████████████████████████████████████
████████████

condition which would have disqualified Suhanec from continued service.  Instead, the regulations give discretion to treating personnel, such as Retterath and Wittkopp, to determine whether the symptoms they witness interfere with the soldier's ability to continue to serve.

### b.   *Of the Kind the Discretionary Function was Meant to Shield*

Based on the forgoing, the first discretionary function exception prong is met; the decision whether to refer Suhanec for further evaluation involved an element of choice or judgment.  The next step is to determine whether it was the type of discretionary action the exception was designed to shield.  Here, Plaintiff can be understood to argue that the mental health professionals were negligent when they observed signs that could potentially disqualify Suhanec for continued service, but failed to refer him to an MEB to determine whether he was still fit to serve.

As shown above, the decision whether or not to refer for further evaluation was left by Army regulation to the discretion of the mental health professionals.  As the Supreme Court has recognized, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion," as AR 40-501 Chapters 3 and 5 do here, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.  The decision of whether a soldier is still fit to serve is precisely the type of discretionary decision involving questions of Army policy and allocation of resources the exception was designed to shield.  As such, the Court finds that it does not have subject matter jurisdiction over this claim.

### 3.   Failure of Mental Health Professionals to Properly Diagnose or Treat Suhanec

Plaintiff's claims against the mental health professionals can also be understood as arguing that they failed to properly diagnosis and treat Suhanec, which reads as a claim for medical

12

negligence.  *See* Compl., ¶¶ 3.5, 3.8; Resp. at 27–28.  The argument is that the mental health professionals should have diagnosed Suhanec with an immediately disqualifying condition, treated him differently, or better monitored him once they chose a course of treatment.

For claims of medical negligence, the Ninth Circuit has directed that "[o]rdinary occupational or professional judgments are not protected by the discretionary-function exception." *Alfrey v. United States*, 276 F.3d 557, 566 (9th Cir. 2002) (citing *Sigman*, 217 F.3d at 796); *see also Fang v. United States*, 140 F.3d 1238, 1242 (9th Cir. 1998) ("the United States is *not* immune from claims which challenge the actual administration of medical care by its employees when the claims do not concern actions which are the product of judgment driven by the consideration of competing policy-based choices") (emphasis in original); *Trap v. United States*, No. 13-cv-00003, 2017 WL 8793328, at *34–*35 (C.D. Cal. Oct. 31, 2017); *Lyons v. United States*, No. 03-cv-244, 2007 WL 4553970, at *10–*14 (N.D. Ohio Dec. 19, 2007).  Thus in *Sigman*, the Ninth Circuit held that the discretionary function exception did not shield the government from liability against a negligence suit brought after a recently discharged soldier killed the mental health professionals who provided the diagnosis for which he was discharged from military service.  *See Sigman*, 217 F.3d at 795–96.  In examining a claim for the failure to diagnose, treat, and control the mentally unstable soldier, the Ninth Circuit drew a line between "the exercise of governmental discretion," which the exception shielded, and "claims of garden-variety medical malpractice," which it did not.  *Id.* at 795.  Thus, Plaintiff's claim sounding in medical negligence must survive discretionary function exception analysis under the reasoning of *Sigman*.

### 4.  Cassidy's Failure to Report Suhanec's Absences

Plaintiff argues that Cassidy, who at the time served as Suhanec's Assistant Unit Armorer,

was negligent when he failed to report that, in the weeks prior to the shooting incident, Suhanec was persistently absent from his post.  Resp. at 17–19.  According to Plaintiff, Suhanec would frequently absent himself from Unit Armory duty without permission or proper justification and Army regulations required Cassidy to report these absences.  The United States seeks dismissal of this claim, arguing that Plaintiff fails to identify a non-discretionary regulatory mandate requiring Cassidy to report Suhanec's absences based on the relative lack of severity of those absences.  Reply at 18–19.

a.   *Element of Judgment or Choice*

Plaintiff relies on a web of intersecting Army regulations and the Uniform Code of Military Justice ("UCMJ") to argue that Cassidy was required to report Suhanec's absences from his post.  As Plaintiff argues, the UCMJ makes dereliction of duty and vacating one's post a criminal offense.  *See* Uniform Code of Military Justice, § 892, art. 92, 10 U.S.C.A. § 892.  Also, according to Plaintiff, the Army's regulations addressing physical security of arms, ammunition, and explosives ("AA&E"), AR 190-11, required Cassidy to report this dereliction of duty as "[a]ll personnel involved in AA&E will be fully cognizant of their responsibilities to observe and report promptly to the commander any incident or condition which might result in temporary or permanent disqualification of such personnel."  Army Regulation 190-11, Physical Security of Arms, Ammunition, and Explosives at 10 (Nov. 2006), available at

14

https://www.customvault.com/docs/specs/AR%20190-11.pdf ("AR 190-11").[6, 7]

The United States argues that, based on the facts presented, Suhanec's absences did not rise to criminal dereliction of duty.  Instead, Suhanec testified that in the two weeks prior to the attack, he would show up at the Unit Armory for five to ten minutes, then excuse himself, telling Cassidy that he was heading back to his barracks.  *See* Dep. of Jesse Suhanec at 76:16–24, 136:18–138:1.  Cassidy testified that, in absenting himself from his post, Suhanec told Cassidy that he was leaving to study for a promotional exam or to work on an application for a program meant to help soldiers transition into civilian life.  Decl. of Staff Sergeant Kyle E. Cassidy, Dkt. No. 61 ¶¶ 2, 4 (Cassidy Decl.).

Reviewing these arguments, it is clear that there is an underlying question as to whether Suhanec's actions rose to the level of dereliction of duty.  The question itself exemplifies the discretion left to Cassidy to determine whether the behaviors he observed constituted dereliction of duty.  Plaintiff has presented no regulations requiring Cassidy to independently investigate his superior's reasons for not being at his post.  Nor, does Plaintiff identify a singular action observed

---

[6] Plaintiff provides a copy of AR 190-11 at Decl. of James J. Raffa, Ex. 6, Dkt. No. 49 at 135–143.  This version, however, does not contain the cited portion.  As such, the Court relies on a version containing the same provision found online.

[7] Plaintiff also relies on two other Army regulations, AR 190-30 (Military Police Investigations) and AR 195-2 (Criminal Investigation Activities), as requiring Cassidy to report Suhanec's absence from his post.  Resp. at 17–18.  As the United States points out, however, Plaintiff has not provided the relevant portions of these regulations.  Reply at 18.  Instead, Plaintiff relies on Field Manuel 27-1 (Legal Guide for Commanders) as requiring reporting because it states that "ARs 190-30 and 195-2 require you to report criminal activity, known of suspected, to the military police for appropriate investigation."  Resp. at 17 (citing Decl. of James J. Raffa, Ex. 5, Dkt. No. 49 at 134).  The United States responds that this manual is only applicable to commanders, which Cassidy was not.  Reply at 18.  Regardless of applicability based on rank, however, and based on the evidence presented by the parties, AR 190-30 and AR 195-2 appear to provide no more than a duplicative requirement as AR 190-11, *i.e.* that Cassidy would have been required to report Suhanec's dereliction of duty.  As such, the applicability of these regulations is resolvable on the same grounds as this argument under AR 190-11.

by Cassidy, which triggered a mandatory reporting requirement.  Instead, the regulation Plaintiff relies on, AR 190-11, requires reporting only in the case of "any incident or condition which *might* result in temporary or permanent disqualification of such personnel." AR 190-11 at 10 (emphasis added).  As use of the permissive "might" in this regulation reveals, AR 190-11 leaves discretion to the reporting soldier to determine what actions they believe severe enough to require temporary or permanent disqualification.  As such, the regulations leave the decision to report based on observed behavior to the judgment of the reporting soldier.

### b.   *Of the Kind the Discretionary Function was Meant to Shield*

The element of judgment or choice embodied in AR 190-11 is of the kind the discretionary function exception was meant to shield.  Determining when behavior, such as absenting oneself from one's post, reaches a level requiring reporting involves numerous elements of judgment, including respect and deference owed to a superior and mindfulness of where the Army's resources are best spent.  The Court finds that it does not retain subject matter jurisdiction over this claim.

### 5. Cassidy's Failure to Prevent Suhanec from Removing the 9mm and Ammunition from the Unit Armory

Plaintiff claims that Cassidy was negligent the day of the shooting when he failed to prevent Suhanec from accessing the Unit Armory.  Resp. at 19–21.  According to Plaintiff, and based on depositional testimony from Suhanec, on that day Suhanec interacted briefly with Cassidy in the Unit Armory before taking the firearm and ammunition from a locker, placing them in a duffle bag, and leaving to procure a vehicle to drive off of the base.  Resp. at 20–21; *see also* Dep. of Jesse Suhanec at 131:8–134:2.  According to Suhanec, Cassidy did not try to stop him from leaving, which, Plaintiff argues, contravened mandatory Army regulations regarding the secure storage of weaponry.

16

According to the United States, and based on a signed declaration from Cassidy, the morning of the incident Cassidy opened the Armory and interacted briefly with Suhanec when he arrived.   Cassidy Decl. ¶ 7.   Suhanec told Cassidy that he needed to double check storage paperwork before proceeding to the back of the Armory where he procured the 9mm handgun and ammunition.  Cassidy stated that Suhanec seemed like his "normal, quiet self" and that it was not unusual for Suhanec to check his paperwork.  *Id.* ¶ 8.  Based on this interaction, Cassidy did not see Suhanec take the handgun and ammunition and only realized they were missing after Suhanec had left the base some hours later.   *Id.* ¶ 10.   The United States argues that throughout this interaction, Plaintiff can point to no mandatory regulation which Cassidy contravened.   Instead, Suhanec had full access to the Unit Armory, thus gaining access to the weapon and ammunition he used in his attack on Plaintiff without Cassidy's breaching any regulations.

### a.   *Element of Judgment or Choice*

The United States is correct.  Plaintiff again cites to AR 190-11, which requires "custodians of AA&E" to "[e]nsure necessary measures are taken to safeguard AA&E at all times" including from "pilferage, theft, and wrongful destruction."  AR 190-11 at 3.  Additionally, Plaintiff points to further requirements of AR 190-11 to develop plans to "address actions to counter thefts by employees" including "personnel screening . . . and the monitoring to minimize opportunities for employee theft and to detect concealed shortages."  *Id.* at 11.  Plaintiff also makes reference to AR 190-11's requirements for safekeeping keys to storage areas.  *Id.* at 16–17.

On even a cursory reading of AR 190-11, it is clear that the regulation is not applicable to the fact situation before the Court.  Further, none of these cited provisions include a specific mandate that Cassidy is alleged to have violated.  Suhanec, by privilege of his position, and as

17

Cassidy's superior, had access to the Unit Armory.  After complying with the safety protocols of AR 190-11, the regulations give the armory staff discretion to determine who should be allowed to enter and for what purposes.  Thus, the first prong of the discretionary function exception is met.

   *b.*   *Of the Kind the Discretionary Function was Meant to Shield*

Turning to the second prong, the choice of who to allow access to the armory and the privileges afforded therein, is the sort of discretionary action addressed by the discretionary function exception.  Balancing the needs of the armed forces, and its personnel, in accessing weapons with the safety of those weapons, is the sort of balancing envisioned by the exception. The Court, therefore, finds that the United States has met its burden in showing the applicability of the discretionary function exception and that the exception divests this Court of jurisdiction over this claim.

**6.  Palmer's Provision of Keys to an Army Vehicle to Suhanec**

According to Plaintiff, and again based on depositional testimony from Suhanec which is uncontested by the United States, the following took place: After leaving the Unit Armory with a weapon and ammunition in a duffle bag, Suhanec approached Palmer, who maintained the keys for the base vehicles.  Suhanec allegedly asked Palmer for the keys to the van he intended to drive and, when asked by Palmer why he needed the keys, Suhanec responded that he needed them for "arms room stuff."  Resp. at 22 (quoting Dep. of Jesse Suhanec at 80:19).  According to Plaintiff, this answer was insufficiently detailed and violated mandatory Army regulations dictating the circumstances under which a soldier may use an Army vehicle.

The United States responds that the decision by Palmer as to whether Suhanec's proffered

explanation was sufficient, involved an element of discretion.  Reply at 19–20.  The United States claims that the regulation Plaintiff relies on does not provide a mandatory course of action, and, therefore, does not curtail the discretion afforded Palmer.

### a.   *Element of Judgment or Choice*

Plaintiff relies on AR 58-1, entitled Management, Acquisition, and Use of Motor Vehicles. *See* Suppl. Decl. of Maj. Richard Connaroe, Ex. P, Dkt. No. 62-3 ("AR 58-1").  Specifically, he points to the Regulation's mandate that "[t]he use of Army-owned or controlled nontactical vehicles is restricted to official purposes only" and that "[v]ehicles will not be provided when the justification is based solely on reasons of rank, position, prestige, or personal convenience."  *Id.* at 10, 11.  Plaintiff then relies on the penalty provisions of AR 58-1, which states that "[m]ilitary personnel who willfully use or authorize the use of an U.S. Government-owned or -leased passenger vehicles (except for official purposes . . .) may be disciplined," to conclude that Palmer wrongfully supplied Suhanec with keys to the vehicle without a sufficiently specific reason to justify its use.

The regulations Plaintiff cites do not provide any mandate that Palmer violated.  Suhanec supplied Palmer with an official purpose for use of the vehicle, albeit non-specific nor, as it turned out, truthful.  The regulations do not specify to what depths of inquiry a key-holder must go before releasing the keys to a vehicle.  Thus, the regulation leaves the decision of whether a proffered reason suffices to meet the required standard to the discretion of the key-holder.

### b.   *Of the Kind the Discretionary Function was Meant to Shield*

The discretion to determine the sufficiency of a proffered reason for use of an Army vehicle is of the sort envisioned by the discretionary function exception.  Provision of use of Army vehicles

19

involves balancing competing demands for the vehicle.  It is precisely the sort of decision courts were not meant to second guess.  As such, the Court finds that the discretionary function exception applies to this claim and the Court, therefore, lacks jurisdiction over it.

## IV.    MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Anticipating that the Court might find that it had jurisdiction over some of Plaintiff's claims, the United States moves for summary judgment on any such remaining claims.  Under FRCP 56(a), the Court must dismiss these claims if the United States, as movant, shows that "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"An issue of material fact is genuine" where there is "sufficient evidence for a reasonable jury to return a verdict for the non-moving party," *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1104 (9th Cir. 2020) (quoting *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019)), and a fact is "material," where it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Overall, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating there is no genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations removed); *see also VHT, Inc. v. Zillow Grp., Inc.*, No. 15-cv-1096, 2020 WL 2307492, at *5 (W.D. Wash. May 8, 2020).  If the movant will not bear the burden of proof at trial, as here, it may show

20

entitlement to summary judgment by: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim. *VHT*, 2020 WL 2307492, at *5 (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000)). If the movant meets its initial burden, the burden shifts to the non-movant to "identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250). During the course of this inquiry, the Court is required to "view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

**B. Plaintiff's Underlying State Law Claims**

Once a court has established that it has subject matter jurisdiction over an FTCA claim, the United States is liable for tort claims as "if [it were] a private person . . . in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In other words, state tort law is "the source of substantive liability under the FTCA." *Meyer*, 510 U.S. at 478.

Plaintiff's Complaint is not a model of clarity as to which exact state tort causes of action it advances, claiming only "negligence." *See* Compl. ¶¶ 3.1–3.8. It is axiomatic that the tort of negligence requires a four part showing of (1) duty to the plaintiff; (2) breach of that duty; (3) resulting injury; and (4) that the breach of the duty was the proximate cause of the injury, *see Ehrhart v. King Cnty.*, 460 P.3d 612, 617 (Wash. 2020), but multiple theories of negligence exist, often depending on the context of the alleged tort.

As determined above, the Court has jurisdiction over three individual acts of alleged negligence claimed by Plaintiff: (1) Suhanec's induction into military service; (2) his lack of

necessary training before assuming the post of Unit Armorer; and (3) the medical negligence of his mental health professionals.   The United States moves for summary judgment on all three claims.

### 1.  Medical Negligence

The Court has already ruled that it has jurisdiction over Plaintiff's claim for medical negligence.  *See supra* at 12–13.   The United States moves to dismiss this claim pointing out, correctly, that Plaintiff has failed to provide the medical expert testimony necessary to establish the standard of care from which the mental health professionals allegedly departed.   Mot. at 17–18; Reply at 12–14; *see Collins v. Juergens Chiropractic, PLLC*, 467 P.3d 126, 132 (Wash. Ct. App. 2020) ("[g]enerally, the plaintiff must establish the applicable standard of care and proximate cause by medical expert testimony"); *see also Seybold v. Neu*, 19 P.3d 1068, 1074 (Wash. Ct. App. 2001) ("[e]xpert testimony is required when an essential element in the case is best established by an opinion that is beyond the expertise of a layperson").   Plaintiff's Response does not address the United States' contentions.   *See generally* Resp., Dkt. No. 45.   Without expert medical testimony, Plaintiff cannot maintain his claim for medical negligence on the part of Suhanec's treatment providers.   Therefore, the Court will grant the United States' Motion for Summary Judgment as to this claim.

### 2.  Negligent Hiring, Retaining, Training, and Supervising Suhanec

#### a.  *Legal Standard*

Under Washington law, to prove negligence in hiring or retaining an incompetent or unfit employee, a plaintiff must show that the employer "had knowledge of the employee's unfitness or failed to exercise reasonable care to discover unfitness before hiring or retaining the employee."

*Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 206 (Wash. 2018) (citing *Scott v. Blanchet High Sch.*, 747 P.2d 1124, 1128 (Wash. Ct. App. 1987)).  Additionally, an employer may be liable for the separate tort of negligently training or supervising an unfit employee.  *See id.* at 208 (citing *Niece v. Elmview Grp. Home*, 929 P.2d 420, 427 (Wash. 1997)).  Negligent training or supervision contains the same knowledge element as negligent hiring or retaining, as a plaintiff must show the "employer knew, or in the exercise of reasonable care should have known that the employee presented a risk of danger to others." *Id.* (quoting *Niece*, 929 P.2d at 427–28).

Washington courts address this knowledge element through the concept of "legal foreseeability," which examines whether the harm inflicted could have, or should have, been foreseen by the defendant.  *Boy 1 v. Boy Scouts of Am.*, 832 F. Supp. 2d 1282, 1289 (W.D. Wash. 2011) (quoting *Mauch v. Kissling*, 783 P.2d 601, 606 (Wash. Ct. App. 1989).  Employers have a duty to prevent their employees from harming foreseeable victims, *Niece*, 929 P.2d at 426, and foreseeable victims are only those where the harm that befell them was within the "general field of danger" which the employer should have anticipated, *Anderson*, 423 P.3d at 212.  "Foreseeability is a question of fact for a jury unless the circumstances of the injury 'are so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" *Shepard v. Mielke*, 877 P.2d 220, 223 (Wash. Ct. App. 1994) (quoting *McLeod v. Grant Cty. Sch. Dist. No. 128*, 255 P.2d 360, 364 (Wash. 1953)).

       b.   <u>Failure of the Chain of Command to Properly Train Suhanec for the Post of Unit Armorer</u>

Plaintiff claims that Army personnel were negligent when they allowed Suhanec to assume the post of Unit Armorer without proper training.  Resp. at 30–32.  Plaintiff argues that performing a job for which he was not trained created stress and anxiety for Suhanec, contributing to his mental

health issues.  The United States admits that Suhanec did not receive the proper training and certifications until he had been on the job for three months, Reply at 7, but maintains that he went through a through selection process by his superiors that affirmed he was qualified for the job and raised no security concerns, Mot. at 6.  Additionally, the United States argues, an attack on an unarmed civilian miles away from JBLM is not the foreseeable result of a delay of his training for the three month period.

The United States is correct.  While Suhanec did not hold the proper certifications for the position of Unit Armeror, the foreseeable consequences of this oversight was not an attack on an unarmed civilian.  The Court finds that Suhanec's attack on Plaintiff was not within the "field of danger" the Army should have predicted and that it was so extraordinary or improbable that no jury could find it foreseeable.  The Court, therefore, will dismiss Plaintiff's claim for negligent training.

c. *Suhanec's Recruitment*

Plaintiff claims that the Army was negligent when it allowed Suhanec to enlist after the recruiter identified signs that should have disqualified him from enlistment.  Resp. at 25–26. Plaintiff claims that the mental health episode that resulted in Suhanec's attack on Plaintiff was foreseeable given the history of mental health issues.  The Army claims that Suhanec's attack, and his mental health episode, were unforeseeable.  Reply at 3–4.  The Army points out that Suhanec served honorably for four years before his attack on Plaintiff without mental health incidents or problems.

The Court finds that there is a sufficient question of fact regarding foreseeability to leave the question for a jury.  The Army's own regulations dictate that individuals with mental health

24

issues such as those displayed by Suhanec are disqualified from recruitment. Clearly these regulations display a concern on behalf of the military that the stressors of combat could exacerbate existing mental health issues potentially leading to harmful results for both the enlistee and those around him. A jury could find that his predisposition to ███████ might have been exacerbated during Suhanec's time of service and led him to ████████████████████ ██████, which led, in turn, to the shooting. Thus, the Court will deny the United States' Motion for Summary Judgment as to Plaintiff's claims for negligent hiring.[8]

## V.    MOTION TO AMEND

Plaintiff requests that, should the Court grant any part of the United States' Motions, he be granted leave to file an amended complaint. Resp. at 37. The United States opposes leave to amend, arguing that the request is untimely, would create delay, and unduly prejudice the United States. Reply at 20.

The Court finds that the question to foreclose removing the issue from the jury. The Court grants Plaintiff leave to file a Motion to Amend his complaint to be submitted no later than twenty-one (21) days from the date of this Order.

## VI.    CONCLUSION

The Court hereby GRANTS in part and DENIES in part the United States' Motion to Dismiss as follows:

1. The Court DENIES the United States' Motion to Dismiss as to Plaintiff's claim

---

[8] To the extent that Plaintiff may be asserting that the United States is liable under a theory of vicarious liable, *see* Resp. at 33–37, the Court's reasoning as to foreseeability would apply equally to that claim.

regarding Suhanec's recruitment;

2. The Court GRANTS the United States' Motion to Dismiss as to Plaintiff's claim regarding the failure of mental health professionals to order evaluation of Suhanec's fitness for duty;

3. The Court DENIES the United States' Motion to Dismiss as to Plaintiff's claim regarding the failure of mental health professionals to properly diagnose or treat Suhanec;

4. The Court GRANTS the United States' Motion to Dismiss as to Plaintiff's claim regarding Cassidy's failure to report Suhanec's absences;

5. The Court GRANTS the United States' Motion to Dismiss as to Plaintiff's claim regarding Cassidy's failure to prevent Suhanec from removing the 9mm and ammunition fron the Unit Armory; and

6. The Court GRANTS the United States' Motion to Dismiss as to Plaintiff's claim regarding Palmer's provision of keys to an Army vehicle to Suhanec.

The Court hereby GRANTS in part and DENIES in part the United States' Motion for Summary Judgment as follows:

1. The Court GRANTS the United States' Motion for Summary Judgment and dismisses without prejudice Plaintiff's claim regarding Medical Negligence;

2. The Court GRANTS the United States' Motion for Summary Judgment and dismisses with prejudice Plaintiff's claim regarding Negligent Training; and

3. The Court DENIES the United States' Motion for Summary Judgment as to Plaintiff's claim for Negligent Hiring.

The Court hereby GRANTS Plaintiff leave to file a Motion to Amend Complaint due no later than twenty one (21) days from the date of this Order.

DATED this 2nd day of November, 2020.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

27