The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

Kevin D. Anthony,

                Plaintiff,

        v.

United State of America,

                Defendant.

Case No. 3:19-cv-5337-BJR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

      This matter came for trial on December 1, 2021 and December 3, 2021, before the Honorable Barbara J. Rothstein, United States District Judge, sitting without a jury. The Court, having considered the evidence before it, including the testimony of witnesses and the documents and exhibits that were admitted by the Court, having heard argument of counsel, and having reviewed the facts and records of this action, makes the following findings of fact and conclusions of law.

## BACKGROUND

      This matter arises out of an assault that occurred on November 5, 2015 in Tillicum, Washington, near Joint Base Lewis-McChord ("JBLM"). United States Army Ranger Specialist

Jesse M. Suhanec overdosed on her[1] prescribed Adderall, took a loaded weapon from the base's armory, drove an Army vehicle off the base, and shot Plaintiff Kevin D. Anthony, a civilian. Plaintiff survived the assault but was severely injured.

In April 2019, Plaintiff filed a complaint alleging that Defendant United States was negligent in recruiting Suhanec, failed to properly evaluate and medically diagnose her, failed to monitor and report her behavior, failed to properly train her, and failed to prevent her from obtaining the weapon she used to injure Plaintiff. Dkt. 1. Prior to trial, Defendant twice moved the Court to dismiss or grant summary judgment on all of Plaintiff's claims. In November 2020 and September 2021, the Court issued orders that considerably narrowed Plaintiff's claims, such that only the negligent recruitment claim remained for trial. *See* Dkts. 64, 91.

The factual basis of the negligent hiring claim is Plaintiff's allegation that Defendant was aware of a disqualifying condition—self-inflicted scars on Suhanec's arm—that could have foreseeably led to Plaintiff's injuries, but nevertheless allowed Suhanec to join the Army despite explicit rules disallowing the same. Dkt. 91. Plaintiff alleges Suhanec showed her scars to an Army recruiter, the recruiter knew the scars were signs of self-mutilation, and the recruiter advised Suhanec to lie on forms and to Army medical staff about the cause of the scars. Although there were additional steps in the enlistment process—such as medical evaluations that also considered Suhanec's scars—Plaintiff's negligence claim at trial was based only on Suhanec's interaction with the Army recruiter. *See* Dkt. 106 at 3.

---

[1] At trial, Jesse Suhanec (also referred to as Ava Suhanec by friends and family) testified that she now identifies as female and prefers to be addressed as "Ms. Suhanec." Accordingly, this document uses female pronouns in reference to Jesse Suhanec.

**FINDINGS OF FACT**

**I.     Jesse Suhanec's Pre-Enlistment History.**

1.      Suhanec testified at trial, and based on her testimony the Court finds as follows:

2.      Suhanec had a childhood diagnosis of ADHD.  *See* 12/3/21 Trial Tr., 34:1-3.

3.      Suhanec took Ritalin, Focalin, and Adderall as a child and a teenager.  *See* 12/3/21 Trial Tr., 34:11-19.

4.      Suhanec never experienced paranoia, hallucinations, or psychosis when taking her prescribed medications as a child and teenager.  *See* 12/3/21 Trial Tr., 76:21-77:3.

5.      Suhanec never abused her medications.  *See* 12/3/21 Trial Tr., 16:4-5.

6.      Suhanec was diagnosed with depression as a teenager after having suicidal ideation and was hospitalized at a facility for young adults to receive mental health treatment for eleven days.  *See* 12/3/21 Trial Tr., 34:21-35:11.

7.      Suhanec self-cut, leaving scars on her left forearm three times over a period of a couple of months when she was a teenager.  *See* 12/3/21 Trial Tr., 35:18-23.

8.      Suhanec's self-cutting was not a persistent, serious condition.  *See* 12/3/21 Trial Tr., 29:23-30:5.

9.      Aside from one fight that resulted in a suspension from school, Suhanec had no adolescent history of violence and never thought about hurting other people.  *See* 12/3/21 Trial Tr., 20:13-14; 77:4-6.

10.     Suhanec intentionally stopped taking medications before she began her military enlistment process because she assumed those medications would disqualify her.  Suhanec was generally aware of what could and could not disqualify her from joining the military, because she heard about it through a community of other recruits trying to enlist in the military.  *See* 12/3/21 Trial Tr., 68:18-69:16.

## II.     Army Enlistment Procedures and Regulations Regarding Medical Qualifications

11.     Plaintiff argues that the Court must find Defendant acted negligently in recruiting Suhanec because the Army itself has regulations recognizing certain medical conditions—and physical or behavioral signs of those conditions—as disqualifying.  Therefore, the Court will briefly discuss the regulations most relevant to this case.

12.     The Army's medical fitness standards are contained in Army Regulation ("AR") 40-501 ("Standard of Medical Fitness," dated August 4, 2011).  AR 40-501 is the only governing regulation regarding medical fitness.  *See* Exhibit P3, chapter 2, section 2-1, pg. 12.

13.     AR 601-210 ("Active and Reserve Components Enlistment Program," dated February 8, 2011) governs eligibility criteria, policies, and procedures for enlistment and processing of persons into the Army.  Section 2-9 requires applicants to meet the medical standards of AR 40-501, chapter 2.  *See* Exhibit P4.

14.     AR 40-501, chapter 2, section 2-27j provides that "History of suicidal behavior, including gesture(s) or attempt(s) (300.9), or history of self-mutilation, does not meet the standard" for enlistment.  *See* Exhibit P3, Chapter 2, Section 2-27j, pg. 25.

15.     Army recruiters screen recruits for a current diagnosis or verified history of a disqualifying condition, but they are not empowered to decide whether a recruit has a condition if there is no record of one.  At most, a recruiter can flag concerning statements made by the recruit during a prescreening interview or reported on the "Medical Prescreen of Medical History Report" (the "Medical Prescreen Report").  The Medical Prescreen Report is the only medical document that is reviewed and signed by recruiters, and it does not ask questions about self-cutting or other self-injury.  *See* 12/3/21 Trial Tr., 92:22-93:14; 93:24-94:13; 101:6-12; Exhibit J2; Exhibit J7.

16.     Once a recruit submits the Medical Prescreen Report, they complete an in-person physical and medical examination conducted by the U.S. Military Entrance Processing Command

("USMEPCOM") at the U.S. Military Entrance Processing Station ("MEPS") MEPS.  Recruiters have no further control over determinations regarding medical disqualifications.  Medical assessments and diagnoses are made by medical professionals at USMEPCOM, U.S. Army Recruiting Command ("USAREC"), or by outside professionals at the MEPS stage, during which recruits are asked about deliberate self-cutting.  *See* 12/1/31 Trial Tr., 79:18-80:4.

**III.    Suhanec's Enlistment**

        **A.    Suhanec's Testimony**

17.    On February 16, 2011, Suhanec met with Master Sergeant Daniel Hollis at a recruiting station and completed a Medical Prescreen Report.  Hollis was Suhanec's primary recruiter.  Suhanec falsely denied any history of psychiatric diagnoses or treatment on the Report, including her hospitalization for depression and prior behavioral medications.  *See* Exhibit J2; 12/3/21 Trial Tr., 38:3-39:12; 61:3-62:4; 62:16-21.

18.    Suhanec claimed she remembered being coached by one or more Army recruiters to lie about her medical conditions and/or history but could not remember exactly what the coaching was.  Suhanec did not claim that it was Hollis who coached her.  *See* 12/3/21 Trial Tr., 43:14-44:1.

19.    Suhanec claimed she showed Hollis the scars on her left forearm, but she cannot remember when she showed him the scars or what prompted her to do so.  Suhanec testified that she told Hollis the scars were from a skateboarding accident, but that Hollis recognized this as a lie and said "those are not skateboarding scars.  I know what they are."  According to Suhanec, this statement implied that Suhanec needed to come up with a better story to tell medical examiners at MEPS.  *See* 12/3/21 Trial Tr., 61:3-62:4; 62:16-21; 65:1-9.

20.    Following her meeting with Hollis, Suhanec submitted the Medical Prescreen Report and certified under oath that the information on the form was true and complete.  At trial,

1    Suhanec admitted that the information she provided was false.  *See* Exhibit J2; 12/3/21 Trial Tr.,

2    38:3-39:12.

3         21.    On July 12, 2011, Suhanec completed her required in-person physical and medical

4    examination with USMEPCOM at MEPS.  *See* Exhibit J9; 12/3/21 Trial Tr., 41:10-15.

5         22.    During her MEPS exam, Suhanec filled out a Medical History Provider Interview.

6    Suhanec denied her history of depression (Questions 6a and 6c).  She denied her history of

7    deliberate cutting or self-injury (Question 6e).  She denied her school suspension (Question 6h).

8    She denied her history of suicidal ideation (Question 6f).  Suhanec certified under oath that the

9    information on the form was true and complete.  At trial, Suhanec admitted these answers were

10   untruthful.  *See* Exhibit J7; 12/3/21 Trial Tr., 41:16-43:9, 44:5-14.

11        23.    Also during her MEPS exam on July 12, 2011, Suhanec filled out a Report of

12   Medical History.  Suhanec denied any sort of anxiety or panic attacks (Question 17a).  She denied

13   depression or excessive worry (Question 17f).  She denied receiving counseling of any type

14   (Question 17e).  She denied prior evaluation or treatment for mental conditions (Question 17g).

15   She denied that she had ever consulted or been treated by clinics, physicians, healers, or other

16   practitioners within the past 5 years (Question 24).  Suhanec certified under oath that the

17   information on the form was true and complete.  At trial, Suhanec admitted these answers were

18   untruthful.  *See* Exhibit J8; 12/3/21 Trial Tr., 45:22-48:24.

19        24.    The USMEPCOM doctor observed the scars on Suhanec's left forearm and asked

20   her about them.  Suhanec informed the USMEPCOM doctor that the scars were from an accidental

21   injury she suffered while pulling up carpet.  She denied intentional cutting.  *See* Exhibit J8; Exhibit

22   J9; 12/3/21 Trial Tr., 48:25-49:8.

23        25.    The USMEPCOM doctor documented Suhanec's response and took a photograph

24   of Suhanec's left forearm for the Office of the USAREC Surgeon.  On July 21, 2011, USAREC

1  Command Surgeon Colonel Gail Glushko noted that Suhanec's explanation was not sufficient and

2  referred Suhanec for a behavioral health consult for further evaluation.  *See* Exhibit J12; Exhibit

3  J16; Exhibit J17.

4     26.    On August 10, 2011, Suhanec received a psychiatric evaluation by non-military

5  psychiatrist Sheila Judge, M.D. in Philadelphia, Pennsylvania.  *See* Exhibit J18.

6     27.    At trial, Suhanec admitted that during the psychiatric evaluation, she lied to Dr.

7  Judge about the origin of her scars, and that Dr. Judge believed her.  Suhanec admitted that she

8  met with Dr. Judge five times and that each time she concealed or mispresented information about

9  her scars and her history of psychiatric treatment.  For example, Suhanec told Dr. Judge that she

10  had no history of prescription drug use, when in fact Suhanec had been prescribed ADHD drugs

11  as a child and teenager.  *See* Exhibit J18; 12/3/21 Trial Tr., 49:10-19; 69:17-70:14.

12     28.    Based on the information Suhanec provided, Dr. Judge determined that the

13  superficial wounds on Suhanec's left forearm appeared to be consistent with her explanation of

14  accidental injury, that Suhanec met no criteria for any psychiatric or substance use disorder, and

15  that there was no limitation on Suhanec's ability to serve in the military.  *See* Exhibit J18.

16     29.    The USMEPCOM Chief Medical Officer and the USAREC Command Surgeon

17  subsequently determined Suhanec was medically qualified for enlistment.  *See* 12/1/21 Trial Tr.,

18  60:7-61:3.

19     30.    Suhanec never disclosed to anyone in the Army that she was previously diagnosed

20  with ADHD, psychiatrically hospitalized, or prescribed psychiatric medications, and in fact

21  affirmatively misrepresented to the contrary under oath.  *See* 12/3/21 Trial Tr., 67:15-68:17.

22     31.    Prior to her delayed enlistment on August 26, 2011, Suhanec signed a Statement of

23  Enlistment.   She certified under oath that she had provided complete details and accurate

24  background information regarding her controlled drug and alcohol use, financial, moral, and

1    physical history.  Suhanec testified that these representations were untruthful.  *See* Exhibit J19, pg.

2    2; 12/3/21 Trial Tr., 70:15-71:13.

3         32.    Suhanec also represented to the Army in her Statement of Enlistment that she had

4    provided her recruiter and/or guidance counselor with all information required on her application

5    for enlistment.  She certified in writing that she had read and fully understood the contents of this

6    form and that no one had told her to conceal information.  Suhanec testified that these

7    representations and her certification were untruthful.   *See* Exhibit J19, pg. 2; 12/3/21 Trial Tr.,

8    71:14-21.

9         33.    Suhanec also specifically represented in her Statement of Enlistment that she had

10   not concealed any medical information and that no one had told her to conceal information.  At

11   trial, Suhanec testified that this was false.  *See* Exhibit J19, pg. 3; 12/3/21 Trial Tr., 71:22-72:9.

12        34.    Suhanec testified that she was aware the disclosure of all pre-enlistment medical

13   conditions was important to the Army and could have impacted her ability to enlist.  *See* 12/3/21

14   Trial Tr., 73:17-24.

15        35.    On August 26, 2011, Suhanec enlisted in the Army in the delayed enlistment

16   program.  *See* Exhibit J21.

17        36.    On March 13, 2012, Suhanec signed, under oath, a substantially similar Statement

18   of Enlistment making the same misrepresentations about her qualifications and concealing

19   information.  *See* Exhibit J23.

20        37.    On March 13, 2012, Suhanec also filled out and signed an Introductory

21   Preaccession Interview Form.  The Form asked Suhanec if there was anything Army doctors did

22   not know about that could prevent Suhanec from completing her basic training, such as psychiatric

23   care and counseling or attempts to commit suicide.  Suhanec selected "no."  Suhanec admitted at

24   trial that her response was untruthful.  *See* Exhibit J24; 12/3/21 Trial Tr., 74:6-75:6.

1    38.    On March 13, 2012, Suhanec was discharged from the delayed enlistment program

2    and entered active-duty service.  *See* Exhibit J22.

3    **B.    Master Sergeant Hollis's Testimony**

4    39.    Master Sergeant Daniel Hollis has been employed by the Army for 25 years and

5    currently serves as the senior master trainer for the Seattle USAREC.  *See* 12/1/21 Trial Tr., 33:16-

6    18; 35:21.

7    40.    Hollis previously served as a United States Army Ranger with five combat tours.

8    *See* 12/1/21 Trial Tr., 34:10-12.

9    41.    Hollis began recruiting in 2004.  *See* 12/1/21 Trial Tr., 38:9-21; 49:10-12.

10   42.    Hollis joined the Doylestown, Pennsylvania recruiting office in February 2011 as a

11   Station Commander overseeing approximately five to six recruiters.  *See* 12/1/21 Trial Tr., 38:9-

12   21; 49:10-12.

13   43.     As station commander, Hollis managed the Doylestown recruiting station,

14   including the recruiters.  He also performed quality-control checks to validate that the recruiters

15   he supervised were following proper procedures.  *See* 12/1/21 Trial Tr., 39:2-13; 40:23-41:8.

16   44.    In Hollis's experience as a recruiter, Station Commander, and First Sergeant, he

17   observed that recruits had various ways to learn what could disqualify them from enlistment and

18   what they should and should not say to recruiters or doctors during their enlistment process.  *See*

19   12/1/21 Trial Tr., 51:11-18.

20   45.    Hollis recalled Jesse Suhanec as a former Doylestown recruit who wanted to join

21   the Army Ranger battalion.  Hollis recalls that Suhanec was originally disqualified due to her

22   defective trigger finger but received a medical waiver from the Army.  *See* 12/1/21 Trial Tr., 53:4-

23   21; 56:14-18.

24

46.     Hollis remembered meeting with Suhanec for a prescreening interview.  Hollis denied that Suhanec showed him the scars on her forearm during that meeting, and he denied that Suhanec disclosed any disqualifying medical or mental health conditions, other than her trigger finger.  He denied telling Suhanec to lie about her scars or past medical history at MEPS.  *See* 12/1/21 Trial Tr., 61:4-7; 62:1-8; 12/3/21 Trial Tr., 90:24-91:6; 96:2-16.

47.     Hollis also denied ever advising any recruit to lie about his or her disqualifying conditions during the recruitment process, which would violate Army regulations.  *See* 12/1/21 Trial Tr., 62:9-63:10.

48.     Hollis testified that no enlistment is worth admitting a recruit that might hurt somebody or themselves, and furthermore that it was unlikely that disqualified individuals would be able to complete basic training.  *See* 12/1/21 Trial Tr., 62:9-63:10.

49.     Hollis has never been disciplined by the Army, including for any recruiting improprieties or regulatory violations.[2]  *See* 12/1/21 Trial Tr., 63:15-19.

**IV.     Suhanec's Assault of Kevin Anthony**

50.     Between March 2012 and May 2015, Suhanec performed well in basic training, airborne ranger school, and ranger school.  *See* 12/3/21 Trial Tr., 77:10-18.

51.     Between March 2012 and August 2015, Suhanec had no prior incidents in the military.  *See* 12/3/21 Trial Tr., 77:19-21.

---

[2] Jennifer Yanick, another Doylestown Army recruiter, also testified.  Although Yanick appeared to be a credible witness, she did not remember any interactions with Suhanec.  *See* 12/1/21 Trial Tr., 78-80.   Therefore, the Court does not find her testimony helpful and does not rely on it in the Court's findings of fact.

52.     Upon her return to the base, beginning August 2015 and continuing until November 2015, Suhanec received mental health treatment from the Army.  Part of this treatment included a prescription of Adderall.[3]

53.     In the week leading up to November 5, 2015, Suhanec began to experience an adverse reaction to her Adderall.  She experienced severe paranoia and hallucinations.  She felt she was being watched and was in imminent danger.  *See* 12/3/21 Trial Tr., 55:11-56:19.

54.     On the morning of November 5, 2015, Suhanec decided to take all of her Adderall, ingesting an amount far exceeding the maximum safe dosage.  Believing that enemies were "closing in on [her]," she took a loaded gun from the base's armory and drove an Army vehicle off the base.  Suhanec saw Plaintiff's vehicle and thought it was following her.  She approached Plaintiff and demanded that he give her his car.  When he refused, Suhanec shot him several times. *See* 12/3/21 Trial Tr., 13:20-14:3; 57:7-58:2; 75:7-9.

55.     Prior to the Adderall overdose on November 5, 2015, Suhanec had never taken more than the prescribed amount or considering doing so.  *See* 12/3/21 Trial Tr., 75:10-12; 76:3-4.

56.     Suhanec said she believed that if she had not overdosed on Adderall on the morning of November 5, 2015, she would not have taken a firearm from the JBLM armory or assaulted Plaintiff.  *See* 12/3/21 Trial Tr., 76:12-17.

---

[3] Plaintiff's medical negligence claim was previously dismissed from this case with prejudice because Plaintiff failed to present the requisite expert testimony to support his claim of medical negligence. *See* Dkt. 64, pg. 22; *see also* Dkt. 89, ¶ 54 (Plaintiff's expert confirmed "there is no basis for a Medical Negligence Claim").  Accordingly, Defendant did not present exhibits or testimony regarding Suhanec's medical treatment at trial.  For a complete statement of facts on Suhanec's medical treatment, *see* United States' Motion for Summary Judgment and Motion to Dismiss for Lack of Subject Matter Jurisdiction, Dkt. 23, at pgs. 8-10.

1    57.    Prior to the week of November 5, 2015, Suhanec had never experienced paranoia,

2    hallucinations, or psychosis, including when she was prescribed Adderall in high school.  *See*

3    12/3/21 Trial Tr., 76:21-77:3.

4    58.    Prior to November 5, 2015, Suhanec had never thought about hurting other people

5    except in combat and had no plan to harm other people.  *See* 12/3/21 Trial Tr., 77:4-9.

6    **V.    Suhanec's Credibility**

7    59.    The Court finds that Suhanec's testimony regarding her enlistment and her

8    interactions with Army recruiters is not credible.  Suhanec's trial testimony was inconsistent with

9    her deposition (*see infra* § III.A.), and she has admitted to lying numerous times, including under

10   oath.  Furthermore, Suhanec's description of her enlistment is directly contradicted by Hollis's

11   testimony.  If the Court were to credit Suhanec's account, it would necessarily find Hollis's false.

12   The Court finds Hollis to be a credible witness based on his demeanor at trial and the consistency

13   of his testimony.    The Court bases its findings on the following inconsistencies,

14   misrepresentations, and false statements in Suhanec's testimony and in the record.

15   60.    First, Suhanec admitted that her trial testimony about her conversation with Hollis

16   was different than her sworn deposition testimony on February 10, 2020, and that her sworn

17   deposition testimony was untruthful.  *See* 12/3/21 Trial Tr., 65:15-66:1.

18   61.    Specifically, Suhanec stated during her deposition that an Army recruiter[4] asked

19   her how she got the scars on her forearm.  At her deposition, Suhanec said that she initially

20   responded that they were the result of a skateboarding, but that the recruiter did not believe her,

21   and that Suhanec ultimately admitted she had cut herself.    According to Suhanec's deposition

22

23   [4] Suhanec could not identify the recruiter during her deposition.  She testified at trial that between her deposition and trial, her mother had reminded her that the recruiter was Hollis.  *See* 12/3/21 Trial Tr., 61:3-62:4; 62:16-21.

24

testimony, the recruiter then explicitly told her to come up with a better excuse than a skateboarding accident when examined by doctors at MEPS.   At trial, however, Suhanec specifically denied that Hollis asked her how she got the scars and specifically denied that she told Hollis that she cut herself.  She also testified that Hollis implied, but did not explicitly say, that she should come up with a better excuse.  Suhanec stated that she could not remember exactly what was said during her conversation with Hollis. *See* 12/3/21 Trial Tr., 43:14-44:1; 44:17-24; 65:2-14.

62.    At trial, Suhanec testified that she made a conscious choice to lie to the Army in order to enlist, despite knowing that she had a likely disqualifying condition.  Suhanec testified that it was always her plan to lie to get into the military. *See* 12/3/21 Trial Tr., 66:14-67:2; 67:11-14.

63.    As discussed above, Suhanec admitted to making false representations on numerous forms she filled out as part of the enlistment process and falsely certifying those representations under oath.   The false representations included completely concealing her psychiatric history, her ADHD diagnosis, and her history of depression and self-cutting, and her hospitalization. *See supra* § III.A.

64.    After the assault, Suhanec was evaluated by forensic examiners from the State of Washington in connection with her criminal prosecution.  The interview was relied upon by the Washington State clinicians to complete a forensic mental health report that was released to the court as part of her criminal case.  Suhanec knew that it was important to be candid and truthful with the clinicians because they were trying to determine whether Suhanec could plead insanity as a defense. *See* Exhibit D2; 12/3/21 Trial Tr., 78:10-17; 78:18-79:6.

65.     Nevertheless, during the evaluation, Suhanec falsely denied being suspended from school and falsely denied a history of self-cutting.  *See* Exhibit D2, pg. 4; 12/3/21 Trial Tr., 79:7-25; 77:22-78:2.

66.     Given Suhanec's history of knowingly making misrepresentations under oath to the Army, to physicians, and during her testimony, the Court does not credit her testimony that she showed Hollis her scars and that he recognized them as evidence of a disqualifying condition. Rather, the Court finds credible the account of Hollis, a complaint-free recruiter who has been serving in the Army for 25 years, and whose testimony was consistent and reasonable.  Therefore, the Court finds that Hollis never saw Plaintiff's scars and never counseled her to lie about them on forms or to medical examiners.

## VI.     Dr. Adams's Testimony and Other Medical Evidence Regarding Causation

67.     Dr. William Adams was presented as a medical expert to express an opinion on the cause of Suhanec's conduct on November 5, 2015.  Dr. Adams is a board-certified psychiatrist who has been practicing for approximately 40 years.  *See* 12/3/21 Trial Tr. 4:16-25.  He specializes in psychiatry and addiction.  Dr. Adams explained that Suhanec's assault of Plaintiff was caused by a psychotic reaction to the Adderall and subsequent Adderall overdose.  Dr. Adams noted that Suhanec began experiencing psychosis days before November 5, 2020, and that the record indicates Army psychiatrists were not aware of this adverse reaction.  *See* 12/3/21 Trial Tr., 21:14-22:20.

68.     Forensic doctors who examined Suhanec after her arrest noted that she exhibited psychotic behavior at first, but that it quickly dissipated as the effects of the Adderall wore off. Based on this and other medical evidence from treating psychiatrists, Dr. Adams opined that Suhanec was not at risk of acting in a similar way absent an Adderall overdose.  *See* 12/3/21 Trial Tr., 14:9-15.

69.     Other Washington State medical professionals who evaluated Suhanec and reviewed her medical history also determined that the medical cause of Suhanec's assault was the Adderall overdose.   They likewise concluded that she was at a low risk for reoffending and dangerous behavior.   *See* Exhibit D3, Forensic Neuropsychological Evaluation Report, dated March 31, 2016, at pg. 9; Exhibit D2, Forensic Mental Health Report, dated July 29, 2016, at pg. 29.

## CONCLUSIONS OF LAW

### I.     Federal Tort Claims Act

1.     Under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), the United States shall be liable for tort claims "for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or commission occurred."  The United States shall be liable for tort claims only "in the same manner and to the same extent as a private individual under like circumstances.  28 U.S.C. § 2674.

2.     The parties do not dispute that Suhanec's actions constitute the intentional tort of assault and battery for which the United States cannot be held vicariously liable.  28 U.S.C. § 2680(h).  Rather, Plaintiff relies on Ninth Circuit precedent that if the assault and battery is the result of negligent hiring then the government's waiver of immunity does not apply.  *Brock v. United States*, 64 F.3d 1421, 1425 (9th Cir. 1995); 28 U.S.C. § 2680(h).  The United States cannot be held liable for claims arising out of assault and battery, but it can be held liable if the assault and battery resulted from negligent hiring.  *Brock*, 64 F.3d at 1425; 28 U.S.C. § 2680(h).  In this case, however, Plaintiff has not made out a claim for negligent hiring, and thus the government's immunity has not been waived.

## II.     Negligent Hiring

3.     Plaintiff has failed to establish by a preponderance of the evidence that the Army negligently hired Suhanec.

4.     The parties agree that Washington law applies to Plaintiff's negligent hiring claim. *See* Dkt. 64.

5.     Under Washington law, to prove negligence in hiring an incompetent or unfit employee, a plaintiff must prove by a preponderance of the evidence that the Army "had knowledge of the employee's unfitness or failed to exercise reasonable care to discover unfitness before hiring or retaining the employee." *Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 206 (Wash. 2018).

6.     Whether an employer is held responsible for injuries resulting from an employee's unfitness is determined by "legal foreseeability," which examines whether the harm inflicted could have, or should have, been foreseen by the defendant. *Boy 1 v. Boy Scouts of Am.*, 832 F. Supp. 2d 1282, 1289 (W.D. Wash. 2011) (quoting *Mauch v. Kissling*, 783 P.2d 601, 606 (Wash. Ct. App. 1989). Employers have a duty to prevent their employees from harming foreseeable victims, *Niece v. Elmview Group Home*, 929 P.2d 420, 426 (Wash. 1997), and foreseeable victims are only those harmed within the "general field of danger," which the employer could have reasonably anticipated, *Anderson*, 423 P.3d at 212.

7.     Here, Plaintiff has failed to demonstrate that the Army had knowledge of Suhanec's unfitness or that the Army failed to exercise reasonable care to discover Suhanec's unfitness. Rather, the evidence demonstrates that the Army made diligent efforts to confirm Suhanec's fitness for enlistment, including physical examinations and numerous forms requesting important information that Suhanec misrepresented or omitted. The Army did not take Suhanec at her word regarding the scars, but rather took the addition precaution of requesting a psychiatric

1   evaluation for Suhanec. The inability to verify Suhanec's pre-enlistment medical conditions was

2   due solely to Suhanec's active concealment of those conditions, not negligence by the Army.

3         8.     As an additional measure, the Army referred Suhanec for a non-military psychiatric

4   evaluation by Dr. Judge, the Army relied on Dr. Judge's professional psychiatric opinion that

5   Suhanec met no criteria for any psychiatric or substance use disorder. It was reasonable for the

6   Army to rely on the opinion of Dr. Judge, who was professionally trained to assess Suhanec's

7   psychiatric fitness.

8         9.     Plaintiff presented no evidence that, based on what the Army knew about Suhanec

9   at the time she enlisted, Plaintiff was a foreseeable victim. The medical evidence in the record,

10   including the testimony of Dr. Adams, established that Suhanec assaulted Plaintiff due to Adderall-

11   induced psychosis and an acute overdose of that medication. It is undisputed that Suhanec had

12   never previously abused medications, experienced psychosis, or engaged in similar acts before she

13   committed the assault on November 5, 2015. Therefore, no employee of the Army knew or should

14   have known in 2011 that Plaintiff could be a victim of Suhanec's violent assault in 2015. *See*

15   *Smith v. Sacred Heart Med. Ctr.*, 184 P.3d 646, 650 (Wash. Ct. App. 2008) (holding that there was

16   no showing that employer knew or should have known that employee was a danger to patients

17   when there was no showing that employee had engaged in similar acts before he committed the

18   intentional torts).

19         10.    Plaintiff previously asserted a medical negligence claim in this case related to the

20   Army's outpatient treatment of Suhanec in 2015. Under Washington law, Plaintiff was required

21   to support that claim with expert testimony establishing that Suhanec's violent behavior was

22   predictable based on information known to those mental health professionals who treated

23   Suhanec. *See Volk v. DeMeerler*, 386 P.3d 254, 272-73 (Wash. 2016). Despite being given two

24   opportunities, Plaintiff was unable to support his medical negligence claim with expert

FINDINGS OF FACT AND CONCLUSIONS OF LAW
[Case No. 3:19-cv-5337-BJR] - 17

testimony.  *See* Dkt. 89, ¶ 54 (Plaintiff's expert confirmed "there is no basis for a Medical Negligence Claim").  If no expert would opine that Plaintiff was a foreseeable victim based on information known by Army mental health and medical professionals during their treatment of Suhanec between August 2015 and November 2015, it is even less likely that the Army could have foreseen Suhanec's assault in 2011 when Army medical staff had even less information at their disposal.  Plaintiff has failed to establish foreseeability by a preponderance of the evidence.

11.    Accordingly, because Plaintiff has failed to establish negligent hiring, Defendant retains sovereign immunity and Plaintiff's suit fails.

**III.    The Discretionary Function Exception**

12.    The discretionary function exception bars all claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  When the discretionary function exception applies, the government does not merely have a defense to liability—it retains its "immunity from suit" altogether.  *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002).  When the government retains sovereign immunity, the Court lacks subject matter jurisdiction over the plaintiff's claims and, therefore, must dismiss them.  *See Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996).

13.    The Supreme Court has enumerated a two-part test for determining whether a claim is barred by the discretionary function exception.  *See Berkovitz v. United States*, 486 U.S. 531 (1988).  First, courts must determine whether the act "involv[es] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536). To determine whether an act involves an element of judgment, courts look to whether "a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow," and an "employee has no rightful option but to adhere to the directive." *Gaubert*, 499 U.S. at 322

(quoting *Berkovitz*, 486 U.S. at 536).  By contrast, if the "challenged actions involve an 'element of judgment or choice,'" then the conduct is discretionary.  *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (quoting *Gaubert*, 499 U.S. at 322).  Therefore, to survive a motion to dismiss, the plaintiff must identify a statute, regulation or policy that is both specific and mandatory, as well as conduct that violates said statute, regulation, or policy. *See Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009) (citation omitted).

14.     Second, if the conduct does involve judgment or choice, courts then look to "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536).  Congress intended to "'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-537 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).  Thus, the exception protects "governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (citation omitted).

15.     Negligent hiring, by its nature, involves policy judgments. *See Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) (citing *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000)); *see also Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield").  Furthermore, "[w]hen discretionary decisions are ones of professional military discretion, they are due the courts' highest deference." *Minns v. United States*, 155 F.3d 445, 451 (4th Cir. 1998).  The discretionary function exception applies even if the government's conduct was negligent or an abuse of discretion. *See Gaubert*, 499 U.S. at 323.

16.     This Court previously held that the discretionary function exception did not apply to Plaintiff's negligent hiring claim because, in her deposition testimony, Suhanec stated that she informed the Army recruiter of her history of self-mutilation.  Dkt. 64 at pgs. 8-9.  Informing the Army recruiter of this disqualifying condition would have triggered a non-discretionary duty to bar Suhanec's enlistment.  *See id.*  However, Suhanec's deposition testimony was disputed by Hollis at trial, and the Court found Hollis's testimony credible.  Additionally, at trial, Suhanec admitted that her deposition testimony was untruthful and testified that she never actually disclosed to Hollis or anyone in the Army that her left forearm scars were from self-cutting.  *See* 12/3/21 Trial Tr., 65:15-66:1.

17.     Suhanec proceeded to the medical stage of her enlistment and continued to make dishonest statements on disclosure forms and to medical professional.  Army medical staff attempted to verify whether Suhanec had a history of self-mutilation by referring her for a behavioral health consultation.  Based on Suhanec's intentional misrepresentations on her enlistment paperwork and again during her psychiatric evaluations, her disqualifying conditions were not discovered, and she was cleared for enlistment.

18.     Plaintiff has failed to show by a preponderance of the evidence that any United States employee acting in the scope of his or her employment failed to comply with a mandatory, non-discretionary Army regulation during Suhanec's enlistment process.  Therefore, the discretionary function exception applies and, even if Plaintiff had successfully made out a claim for negligent hiring this Court lacks subject matter jurisdiction over that claim.

**IV.     Proximate Cause**

19.     Given that the Court has found that Suhanec was not a credible witness, and that the Army was not negligent in hiring her, the Army's actions cannot be a proximate cause of Plaintiff's injuries.

20.     Furthermore, the Court finds that the testimony of Dr. Adams establishes that there is a lack of proximate cause between the Army's hiring Suhanec and Plaintiff's injury.

21.     Dr. Adams explained that the proximate medical cause of Suhanec's conduct was a psychotic reaction to the Adderall and the subsequent Adderall overdose, both of which occurred in November 2015.  Based on Dr. Adams's testimony, Suhanec's pre-military conditions and behavior, even if known to the Army, would not have suggested that, more than four years after her enlistment, Suhanec would abruptly experience severe paranoia, overdose on her Adderall, and assault a civilian.  Dr. Adams's opinion is consistent with Suhanec's own testimony, as well as the medical professionals who evaluated Suhanec after her assault and determined that Suhanec was not likely to reoffend.

22.     "Mixed considerations of logic, common sense, justice, policy, and precedent" do not support extending the legal consequences of the Army's hiring Suhanec to Suhanec's conduct more than four years later.

## CONCLUSION

Plaintiff has failed to prove the required elements of his negligent hiring claim. Therefore, the Court finds in favor of Defendant in this matter.

DATED this 26th day of April, 2022.

Barbara J. Rothstein
United States District Judge